Alan S. Davis and Helen S. Davis v. Commissioner.
Davis v. Commissioner
Docket No. 741-69.
United States Tax Court
T.C. Memo 1970-170; 1970 Tax Ct. Memo LEXIS 189; 29 T.C.M. (CCH) 749; T.C.M. (RIA) 70170; June 23, 1970, Filed Milton Cades, J. Russell Cades, and Richard L. Griffith, 165 S. King St., Honolulu, Hawaii, for the petitioners. Leo A. McLaughlin, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1964 in the amount of $214,893.09. One of the issues raised by the pleadings has been conceded by petitioners, leaving for our decision the following: (1) Whether the partnership income from a joint venture, Wilder Manor Co., credited *191 to a corporation formed by petitioners, Sanford Building, Inc., was properly includable in petitioners' taxable income. (2) Whether petitioners received ordinary income or capital gain from the disposition of certain real property transferred to the joint venture, Wilder Manor Co. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who at the time of the filing of the petition in this case, resided in Honolulu, Hawaii, filed a joint Federal income tax return for the taxable year 1964 with the district director of internal revenue, Honolulu, Hawaii. Helen S. Davis is a party to this action by virtue of filing a joint return with her husband, Alan S. Davis, who will be referred to herein as petitioner. Petitioner was born in Honolulu, Hawaii and has been connected with business firms in that city all his adult life. For 25 years he was employed by the Hawaiian Trust Company. He held the position of executive vice president of that company when he left its employ to take a position as vice president with Castle and Cooke. After 9 1/2 years petitioner resigned his position with Castle and Cooke to become president *192 of Hawaiian Tuna Packers. Petitioner owned the controlling interest in Hawaiian Tuna Packers. In 1951 petitioner took a position as president of C. Brewer and Company, Limited, a sugar factory, from which position he retired because of being increasingly occupied with the business of the James Campbell Estate, Ltd. Petitioner was and is Chairman of the Board of Trustees of the James Campbell Estate, Ltd., which is a private estate holding approximately 80,000 acres of land on three of the islands of the State of Hawaii. The estate develops real property only on a leasehold basis and rarely sells property outright. A few sales have been made by the estate and on a number of occasions property of the estate has been subject to eminent domain condemnation. In the 1920's petitioner's father purchased real property located at 1001A Wilder Avenue in Honolulu and a one-half interest in a roadway between this property and the adjoining property at 1001 Wilder Avenue for use as a family residence. Upon his death in 1944 the property passed by will to his four children, including petitioner, each of whom received a one-quarter undivided interest. Petitioner conveyed his interest to his sister *193 in 1945 and repurchased it, along with the remaining interests in the property from his brother and sister in 1946. Petitioner used the property as his family residence from the time he acquired the full interest in fee until the transfer of adjoining property as hereinafter set forth. In 1950 petitioner purchased the adjoining residential property at 1001 Wilder Avenue including the other one-half interest in the roadway property, partially as an investment and partially to extend the property around his residence. The property at 1001 Wilder Avenue had a small house on it which petitioner rented for residential use 750 from the time he acquired the property until sometime in 1959. Petitioner who was then 66 years old contacted Francis Weggeland, a real estate salesman, to discuss the possibilities of leasing the 1001 Wilder Avenue property to a developer who would improve it with a cooperative apartment. Petitioner was interested in the most advantageous use of the property as an asset of his estate to provide income for his wife and daughters in the event of his death. The Wilder Avenue property is ideally situated for a multiunit dwelling, especially one of the "high rise" *194 type, since its elevation is such as to afford a beautiful view of the city which cannot be cut off by structures on higher or equal elevation. Petitioner's original plan was to lease the property to a corporation which would construct a multiunit high-rise apartment thereon to be sublet to a second corporation, the stock of which would be sold to various individuals together with a right to occupy an apartment. The construction loan taken by the first corporation would be paid by the sale of stock of the second corporation. Petitioner contemplated setting up a trust to receive the rental payments from the property. Petitioner negotiated with New York Life Insurance Company (hereinafter referred to as New York Life) for longterm financing and with the Bank of Hawaii for interim construction financing, both to be secured by a mortgage on the leasehold and fee interests in the Wilder Avenue property. Petitioner obtained a rezoning of the Wilder Avenue property from single family resitial to apartment. Petitioner and Weggedential to apartment. Petitioner and Weggeland had the initial surveys and architect drawings made. They also had initial drafts of the co-op papers drawn up by *195 their attorneys and formed Sanford Building, Inc. (hereinafter referred to as Sanford Building) which was to be the developer-builder. On September 28, 1960, New York Life advised petitioner that it would commit to long-term financing, conditioned on presale of 75 percent of the units. The Bank of Hawaii agreed to provide construction financing for the venture as soon, among other conditions, as New York Life's commitment took effect. However, because of adverse publicity relative to cooperative apartment projects in general, petitioner was unable to meet the presale conditions of the New York Life commitment and abandoned the leasehold cooperative project toward the end of 1960. The articles of incorporation of Sanford Building which was incorporated prior to the abandonment of the leasehold project were filed on December 8, 1960. Stock certificates were made out to Weggeland and his wife for five shares each, and to petitioner and his wife for 45 shares each. On June 11, 1961, petitioner paid into the corporation the full $1,000 subscription price for the 100 shares issued but the certificates were not delivered to the parties to whom they were made out until a later date. Sanford *196 Building was never actually utilized by petitioner and Weggeland with respect to the leasehold cooperative project which was abandoned. It was suggested to petitioner by San Francisco attorney that he see representatives of Swinerton & Walberg Co. to try to promote the development of the apartment complex. Swinerton, Walberg and West-gate (hereinafter referred to as Swinerton-Walberg) was a joint venture composed of two California corporations, Engineers Limited Pipeline Co. and E.W. Westgate Co., Inc.[1] Petitioner and Weggeland met with Westgate of Swinerton-Walberg to discuss the apartment project including the possibility of its being completed as a leasehold condominium rather than a cooperative. In 1961 the legislature of Hawaii had passed an act specifically providing for sales of condominiums. On September 8, 1961, petitioner and Weggeland entered into a conditional agreement with Swinerton-Walberg to develop a condominium on the Wilder Avenue property under a 65-year leasehold with each apartment owner having an undivided interest in the underlying lease. *197 Petitioner was to retain fee title to the property and receive rental payments. The agreement was conditioned upon Swinerton-Walberg's finding adequate financing for the project within 90 days. Either because Swinerton-Walberg did not want Weggeland to be included in the proposed condominium project or because 751 Weggeland was unwilling to participate therein subsequent to September 8, 1961, petitioner paid Weggeland $2,500 and Weggeland and his wife surrendered their shares in Sanford Building which at that time were delivered to them for endorsement. Westgate informed petitioner that he was unable to obtain financing on a leasehold basis but believed he could do so if the project proceeded as a fee simple arrangement. Petitioner had not proposed or intended to dispose of the fee simple interest in the property and had not considered so doing until Westgate informed him that any further development on the condominium project would have to be on a fee simple basis. On July 1, 1962, Wilder Manor Co., a joint venture stated to be composed of Sanford Building and Swinerton-Walberg was formed to build the condominium and sell the individual units. The joint venture agreement, *198 dated July 1, 1962, provided in part as follows: 1. The parties hereto do hereby form with each other a joint venture (hereinafter called the "Venture") for the sole and limited purpose of building an apartment house project and selling individual units therein on a condominium basis in accordance with Act 180, Session Laws of Hawaii, 1961; said apartment house project is to be constructed on certain lands owned by DAVIS on Wilder Avenue in Honolulu aforesaid, which said lands are to be sold by DAVIS to the Venture at the option of the said Venture, all as more fully described in Exhibit "A" attached hereto and made a part hereof by reference. * * * 5. The respective interests of the parties hereto and in the property of the Venture and in any profits derived therefrom, except as hereinafter specifically modified, shall be: SANFORD… 50% SWINERTON, WALBERG and WESTGATE… 50% The net losses, if any resulting from the Venture shall be borne by the parties hereto in proportion to their interest as shown above. * * * 6. The Venture shall be managed by a management Committe of two members, one selected by SANFORD and one by SW&W, which shall have full authority to act hereunder *199 on behalf of the Venture and shall be in charge of the planning, construction and sale of apartments within the condominium apartment house project; PROVIDED, HOWEVER, that the Management Committee shall from time to time consult with each party hereto with respect to important matters relating to the performance of the project * * * * * * * * * Subject to the direction of the Management Committee, SW&W shall be primarily responsible for the general supervision of the development, building and sale of the condominum apartment house project herein contemplated (hereinafter called the "Project"), including, without limiting the generality of the foregoing, negotiation of construction contracts, architectural drawings, supervision, sales, etc. For such services, SW&W shall receive a fee of 4% of the direct construction costs of the Project, such costs being defined as those resulting from all construction contracts entered into by the Venture for site improvement, construction of the apartment house building and all related facilities and landscaping. * * * 8. All of the expenses incurred by either of the parties hereto on behalf of the Venture from the date of this agreement shall *200 be considered as expenses of the Venture, including, without limiting the generality of the foregoing, the expenses of and cost to DAVIS of settlement with Francis Weggeland, of Honolulu aforesaid, costs incurred in securing tentative loan commitments, interest and carrying charges on loans, further architectural drawings, legal and accounting expenses, telephone and cable charges and all other expenses which are directly attributable to the Project; PROVIDED, HOWEVER, that expenses of RICHARD WALBERG, W. A. SWINERTON and E. W. WESTGATE for travel and overhead expenses shall be the responsibility of SW&W; and PROVIDED FURTHER that all of such expenses shall not include any provisions for salaries or other compensation to any of the parties hereto, their stockholders or representatives. In the event that the Project should not be completed for any of the reasons enumerated in paragraph 7 above, or for any other reason whatsoever, such expenses incurred to the date of abandonment of the project shall be shared by the parties hereto in accordance with their interests in the Venture. 9. In the event that the same should be required for purposes of any of the construction or permanent *201 loans, DAVIS agrees to subordinate the fee simple interest in the lands described in Exhibit A by way of additional security mortgage. Such mortgage shall provide for releases in the event of sale of individual 752 apartments, all as more fully provided for in said Exhibit A. HELEN S. DAVIS, spouse of DAVIS and joint owner of the lands concerned, by signing below, hereby agrees to join with DAVIS in the execution of any and all documents that may be required in connection herewith or in connection with said Exhibit A. 10. In the event that at the time the construction loan is required to be repaid in full there are insufficient proceeds within the Venture for such purpose, the parties hereto agree that the then remaining unsold apartments within the Project shall be equally divided between the parties hereto, together with any interests relating thereto, and each party shall then pay to the holder of the construction loan a sum equal to one half of the monies then remaining due and payable under said loan. The parties further covenant and agree to pay to DAVIS all sums due under said Exhibit A at the required time of payment, if there are insufficient proceeds within the Venture *202 at such time. 11. In consideration of this agreement, DAVIS does hereby covenant, promise and agree to and with SW&W, its successors and assigns, that SANFORD, its successors and assigns, shall well and truly perform and execute all of the covenants herein contained on its part as recited in paragraphs 8 and 10, and upon the failure of the said SANFORD or the failure of its successors or permitted assigns to perform in any particular, the said DAVIS will forthwith pay to the Venture, in United States currency, all sums that may be required by reason of such covenants; and EDWARD W. WESTGATE, of Stockton, California, does hereby covenant, promise and agree to and with all of the parties hereto, their successors and assigns, that E.W. WESTGATE CO., INC., its successors and assigns, shall well and truly perform and execute all covenants herein contained on its part, and upon the failure of the said E.W. WESTGATE CO., INC., or the failure of its successors or permitted assigns to do so in any particular, said EDWARD W. WESTGATE will forthwith pay to the Joint Venture, in United States currency, all sums that may be required by reason of such covenants. * * * 13. All net proceeds from *203 the sales of apartments within the Project, after deduction of sales expenses, closing costs and after provision for an adequate reserve for maintenance, shall be used for the purpose of satisfying the below listed obligations and shall be promptly paid out in the following order of priority: (i) payment to DAVIS under the terms of Exhibit A for the value of the undivided fractional interests in the lands of DAVIS attributable to all apartments so sold. (ii) payment of all construction costs incurred in the Project. (iii) reimbursement of equity capital contributed by SW&W.
(iv) reimbursement of any funds advanced by SW&W or SANFORD for expenses of the Venture subject to reimbursement under the terms of this agreement. (v) payment to SW&W of the 4% fee provided for in paragraph 6 above. (vi) all remaining proceeds shall be distributed in accordance with the terms of this agreement. Also, on July 1, 1962, petitioner entered into an option agreement with Wilder Manor Co., giving the latter the option to purchase the 1001 Wilder Avenue property for $370,000. Exhibit A attached to the joint venture agreement and referred to therein was a copy of an agreement of sale to be *204 executed by petitioners and Wilder Manor Co. On September 1, 1962, petitioners as vendors and Wilder Manor Co. as vendee executed an "Agreement of Sale" of the Wilder Avenue property which agreement was registered on October 31, 1962, in the office of the Registrar of the Land Court of the State of Hawaii. On October 10, 1962, an "Amendment to Joint Venture Agreement" was executed by the parties providing that Swinerton-Walberg would be the agents for Wilder Manor Co. This agreement provided for a fee for the agency services of 5 1/2 percent of the actual "cost of the work." The agency agreement also provided as follows with respect to insurance to be carried: 7. Insurance: During the course of the Project, the Owner will carry Comprehensive Liability Insurance covering bodily injury liability (including automobile) of the Owner and Agent, in limits of $500,000.00 each person and $1,500,000.00 for any one occurrence arising out of the work; third party property damage (including automobile) and contractual liability in limits of $500,000.00 with $1,500,000.00 aggregate limit. The owner will also carry Workmen's Compensation Insurance, in statutory limits, charging exact rates established *205 by the Insurance Commissioner. The Owner shall place insurance coverage damage by fire or the perils covered by the standard extended coverage endorsement and the standard vandalism and malicious mischief endorsement. Said insurance shall 753 cover the work performed or any part thereof, including all materials incorporated in the work and all materials, supplies and destructible equipment or tools located on or about the site of the work. Said insurance shall be kept in full force and effect until completion of the Project and the Agent shall be named as an additional insured thereunder as its interest may appear. * * * No equity capital in addition to the original $1,000 was paid into Sanford Building. Petitioner advanced funds through his agency accounts at Hawaiian Trust Company to the joint venture. Sanford Building also had an account with Hawaiian Trust, with petitioner being responsible for any deficits in the account. Petitioner made the following advances directly to Wilder Manor Co.: $30,000 on October 30, 1962, $35,000 on December 21, 1962, and $75,000 on June 10, 1964. In addition, petitioner on November 25, 1964, transferred $130,000 to the account of Sanford Building *206 which on the same day transferred the funds to Wilder Manor Co. All these advances were repaid by Wilder Manor Co. within a short time, at least one repayment in the amount of $65,000 being made directly to petitioner by Wilder Manor Co. check dated January 30, 1963, drawn to the order of petitioner. This check was, as were all checks of Wilder Manor Co., signed by both Westgate and petitioner. James H. Pflueger, petitioner's son-in-law, was for about 9 months in 1962 paid a salary of $500 per month by petitioner for work in connection with the joint venture. Petitioner charged these salary payments on his records to Sanford Building. After this 9-month period Pflueger became employed as a salesman by Wilder Manor Co. Petitioner was not given notes or any other evidence of indebtedness by Sanford Building for any advances he made directly or through Sanford Building to Wilder Manor Co. and was paid no interest by Sanford Building on such advances. Petitioner was president of Sanford Building from its inception, having been formally elected at the initial meeting of the board of directors on December 7, 1960. Sometime prior to the execution of the joint venture agreement on July 1, 1962, petitioners *207 transferred their shares in Sanford Building to their children. Petitioner continued to act as president of Sanford Building but at no time received any salary from Sanford Building. The last minutes of a meeting of the board of directors recorded in the minute book of Sanford Building shows the meeting as held on July 29, 1962, and the directors present as Alan S. Davis and Helen S. Davis. These minutes recite that "* * * Alan S. Davis was appointed a member of the Management Committee of Wilder Manor to represent the Company with the authority to do such acts and execute such documents on behalf of the company as may be required to carry into effect all action taken by the Management Committee of Wilder Manor Co." Agreements to sell 26 apartments had been entered into prior to completion of the building and after its completion additional sales were made by Wilder Manor Co. By deed dated July 14, 1964, which was registered in the Land Court of the State of Hawaii on July 26, 1964, petitioners transferred fee simple title to the Wilder Avenue property to Wilder Manor Co. The company then transferred title to the 26 apartments previously "sold" to the purchasers and thereafter transferred *208 title to purchasers of various apartments as they were sold. As titles to apartments were transferred and payment therefor received by Wilder Manor Co., petitioners received payment on the sales price of the property they had transferred to Wilder Manor Co. The following payments were made to petitioners from the Wilder Manor escrow account pursuant to the agreement of sale: Date 1964
For
Amount
June 25
Release of 26 apartments
$133,310.00
July 10
Release of 7 apartments
36,815.00
July 17
Release of Apartment No. 105
5,180.00
July 24
Release of 7 apartments
41,440.00
Aug. 4
Release of Apartment No. 104
5,180.00
Aug. 7
Release of Apartment No. 1002
3,700.00
Aug. 25
Release of Apartment No. 1003
6,845.00
Sept. 10
Release of Apartment No. 201
5,180.00
Sept. 14
Release of Apartment No. 304
5,180.00
Sept. 24
Release of Apartment No. 205
5,180.00
Sept. 24
Release of Apartment No. 806
5,180.00
Oct. 14
Release of Apartment No. 306
5,180.00
Dec. 2
Release of Apartment No. 506
5,180.00
Dec. 21
Final payment per escrow instructions dated December 10 and 11,1964
107,573.19
Certain disagreements developed between petitioner and *209 representatives of Swinerton-Walberg which resulted in an agreement for the total interest in the project to be transferred to Swinerton-Walberg. Sanford Building pursuant to an agreement entered into with Swinerton-Walberg on December 7, 1964, assigned its interest in Wilder Manor Co. to Swinerton-Walberg in return for $120,000 representing reimbursement for advances of $75,000 and consideration paid for its interest. In addition, Swinerton-Walberg assumed all obligations of Wilder Manor Co. including the remaining balance owed to petitioners for the Wilder Avenue property. Under the agreement, Swinerton-Walberg specifically agreed to indemnify and hold harmless petitioners against any claims against Wilder Manor Co. Sanford Building is still an active corporation with business interests including an investment of $25,000 in Pflueger Lincoln-Mercury, a corporation of which petitioner's son-in-law, Pflueger, is manager. Prior to the termination of the joint venture, Sanford Building had no cash other than the $1,000 paid in by petitioners for stock, no other liquid assets, and no working capital other than advances by petitioner. Petitioner himself took no active part in the *210 sales of the condominium units. He accepted on behalf of Wilder Manor Co. applications brought to him by the salesmen and in connection with action on such applications reviewed files respecting applicants brought to him by salesmen and discussed the applicants' financial standing with the salesmen. Petitioner countersigned Wilder Manor Co. checks. Petitioner did not hold a real estate license and the only sales of real estate he had made prior to the transaction involving the Wilder Avenue property were of a small ranch used as a personal residence and another personal residence in California. At no time prior to December 1964 were any books or records aside from certain minutes of meetings of the board of directors kept for Sanford Building. Wilder Manor Co. kept records for the joint venture. From these records of the joint venture Hung Chiu Lum prepared Federal income tax returns for Sanford Building and in December 1964 after the assignment of the entire interest in the joint venture project to Swinerton-Walberg "wrote up" some records for Sanford Building which were later transcribed into a bound book by "Mr. Pflueger's accountant." Hung Chiu Lum also audited invoices to *211 be paid by the joint venture where payments were to be approved by petitioner. Hung Chiu Lum was employed as an accountant by the James Campbell Estate, Ltd.
Petitioners on their joint Federal income tax return for the calendar year 1964 reported ordinary income from dividends of $41,292.97 including $31,647.37 from the "Alan Davis Trust," interest income of $9,300.88 including interest from Wilder Manor Co. of $5,066.26, commissions from the James Campbell Estate, Ltd., of $51,858.92 and director fees of $900. They reported long-term capital gain of $339,748.33, of which $339,215.11 was stated to be from "Real Property - 1001 Wilder Ave." This property was shown as acquired in 1951 and sold July 1, 1964, at a sales price of $370,000. The cost or other basis was shown as $30,784.89. Respondent in his notice of deficiency increased petitioners,'taxable income of $221,982.52 as reported on their income tax return by $69,202.13 designated as "Joint Venture income" and $339,215.11 designated as "Gain on sale of real property." Respondent reduced the total income as determined by him by $169,607.56 with the explanation "Capital gain on sale of real property" to arrive at petitioners' *212 taxable income of $461,392.20, giving the following explanations: (a) It is determined that during the taxable year 1964 you received partnership income of $69,202.13 from Wilder Manor Co., a joint venture, which was not reported on your income tax return. Accordingly, your taxable income is increased $69,202.13. (b) It is determined that the land located at 1001 Wilder Avenue, Honolulu, which you sold in the taxable year 1964 755 was property held for sale to customers in the ordinary course of your trade or business. Therefore, the gain realized from the sale of the land in the total amount of $339,215.11 is taxable as ordinary income rather than as long-term capital gains as reported on your income tax return. Accordingly, your taxable income is increased in the amount of $339,215.11. * * * (d) The contra-adjustment to item (b) is made to exclude the gain from sale of property located at 1001 Wilder Avenue, Honolulu as a capital gain. Capital gains are therefore decreased by 50% of $339,215.11 or $169,607.56. Opinion Respondent's primary contention is that petitioner Alan S. Davis rather than Sanford Building was the coventurer with Swinerton-Walberg, either directly *213 or indirectly through an agent, in Wilder Manor Co., and that petitioners did not sell their property to the joint venture but rather contributed it to the capital of the joint venture. Respondent argues that since Wilder Manor Co. was in the business of the development and sale of apartment condominiums on a fee simple basis, petitioner likewise should be considered to be in that business, and the payments which petitioners received with respect to the property contributed to Wilder Manor Co. should be considered to constitute receipts from the sale or exchange of property held by petitioners primarily for sale in the ordinary course of their trade or business. Petitioners take the position that in substance as well as in form the corporation, Sanford Building, was the coventurer with Swinerton-Walberg in Wilder Manor Co. In the alternative petitioners contend that even if petitioner Alan S. Davis should be considered as the coventurer with Swinerton-Walberg in Wilder Manor Co., the facts here show that the Wilder Avenue property was in fact sold by petitioners to Wilder Manor Co., and therefore the gain from the sale of the property constitutes capital gain to petitioners. Petitioners *214 specifically rely on the provisions of section 707, I.R.C. 1954, [2] pointing out that even if petitioner personally were the joint venturer with Swinerton-Walberg, his gain is to be treated as capital gain since he would have owned only a 50 percent and not an 80 percent interest in the partnership. *215 On the basis of the facts in this record we agree with respondent that petitioner Alan S. Davis was in substance the coventurer with Swinerton-Walberg in the Wilder Manor project but agree with petitioners that their transaction with the joint venture in selling their land to the joint venture was in a capacity other than the capacity of petitioner as a member of the partnership and therefore under the provisions of section 707, their gain on the sale constitutes long-term capital gain. 756 The issue of whether in substance petitioner was the joint venturer with Swinerton-Walberg in Wilder Manor Co. is entirely factual. It is to be determined from all the circumstances surrounding the transaction. We have considered all the evidence of record in reaching our conclusion. Petitioner relies on the fact that Sanford Building was a properly formed corporation and contends that it served to limit petitioner's liability with respect to the apartment project. Petitioner states that as long as the corporate entity fulfills a useful business function or carries on business in its own right, the corporate form should not be disregarded, relying on Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). *216 Respondent contends that although Sanford Building was a properly formed corporation, it was not in fact as distinguished from form, the partner in Wilder Manor Co. Respondent points out that under the facts here present petitioner's liability was in no way limited by using the name of Sanford Building as a joint venturer. The facts show that petitioner personally guaranteed performance by Sanford Building of all the financial obligations it specifically assumed in the joint venture agreement. The facts also show that Sanford Building had no assets. The joint venture agreement provided that the parties thereto equally share the profits and losses of the venture. In substance it was petitioner and not Sanford Building who agreed to share losses equally with Swinerton-Walberg. Sanford Building had no assets with which to share any losses and therefore petitioner's guarantee of Sanford Building's obligations under the joint venture agreement amounts to petitioner's personal agreement to share in losses of the venture. Petitioner contends that by having Sanford Building as a joint venturer he limited his liability for unforeseen and unlimited risks. He did not specifically specify *217 what the nature of such risks might be. The facts show that the joint venture carried ample insurance against tort risks. In the light of the fact that petitioner had assumed financial responsibility for Sanford Building's obligations and provided for adequate liability insurance for the joint venture, the reason he claims for having Sanford Building as the named joint venturer is not persuasive. The facts here show that Sanford Building did not in fact function as the joint venturer with Swinerton-Walberg. It had no assets other than the $1,000 paid in by petitioner for its stock. It had no employees unless Pflueger were to be considered an employee for a 9-month period. The record does not disclose any service rendered by Pflueger to Sanford Building. He apparently acted as a salesman for the joint venture but not for Sanford Building. His salary was paid by petitioner and the record is devoid of evidence that the amount was repaid to petitioner by Sanford Building although petitioner stated that on his accounts the amount was charged to Sanford Building. Petitioner rendered the services required of a joint venturer in approving applications for purchases of apartments, countersigning *218 checks and approving invoices. Petitioner contends that he rendered these services as president of Sanford Building. However, he was paid no salary by Sanford Building. In 1964 he reported commissions of $51,858.92 from the James Campbell Estate of which he was chairman of the board of trustees. From this record which shows petitioner to be a man of substantial business experience it is apparent that his services if actually rendered for Sanford Building, should have been compensated for with a substantial salary. Petitioner assisted in financing the apartment project to an appreciable extent by direct advances to Wilder Manor Co. When an advance did go through Sanford Building's account, the amount of the advance would be transferred by petitioner to Sanford Building and the same day transferred from the corporate account to Wilder Manor Co. Petitioner had no evidence of indebtedness from Sanford Building and received no interest payments from Sanford Building. The only purpose served by Sanford Building shown by this record was to retain the earnings from the joint venture for the benefit of petitioner's children to whom its stock had been transferred. This function is merely receiving *219 an anticipatory assignment of petitioner's income for his children's benefit. It is not a function of a joint venturer in a building project. The facts here are similar to those in Lloyd F. Noonan, 52 T.C. 907 (1969) in which we held amounts received by corporations which were listed as limited partners in a partnership in which the sole shareholders were the general partners to be taxable to the general 757 partners. In Lloyd F. Noonan, supra, the general partners were merely attempting to accomplish "income splitting." In the instant case petitioner was attempting to make a gift of his income to his children without including the amount in his taxable income. The fact that Sanford Building was a legally formed corporation and after the years here involved invested its funds in business enterprises does not cause it to be in substance the joint venturer in Wilder Manor Co. during the years 1962 through 1964, when it had no funds, no employees, no books and records, and performed no business activities. See Shaw Construction Co., 35 T.C. 1102, 1114 (1961), and Aldon Homes, Inc., 33 T.C. 582 (1959). We sustain respondent *220 in including the portion of the joint venture income of Wilder Manor Co. allocated to Sanford Building in petitioners' income. However, we agree with petitioner that he did in fact sell the 1001 Wilder Avenue property to the joint venture in a capacity other than as a partner and that under the provisions of section 707 his gain was properly reported as long-term capital gain. The substance of the transaction as well as its form was that of a sale. Petitioners were to be paid for the property with the first available funds and in all events whether the project was a success or failure. Although petitioner, himself, would have been responsible for one-half of the payment, were the joint venture unable to meet its obligations, Swinerton-Walberg would have been responsible for the other half. The contract of sale transferring equitable title to the property to the joint venture was registered at approximately the same time as the joint venture was formed. The joint venture agreement provided for a purchase of the property with each venturer assuming responsibility for one-half the financing and Swinerton-Walberg receiving a fee for its services in managing the project. The entire arrangement *221 is totally contrary to a contribution by petitioner of the property to the joint venture as respondent contends occurred. Respondent makes a weak argument that the $370,000 paid for the property was in excess of its fair market value. The evidence to the contrary is so strong that this contention of respondent's merits little discussion. One basic fact that respondent is unable to brush aside is that the price was fixed between petitioner and a party with an adverse interest. Furthermore, the expert testimony supports a fair market value of $370,000. Respondent relies solely on a $298,000 valuation for "mortgage" purposes in a report that specified that the valuation was not intended to represent "fair market value" for purposes of sale. We do not understand respondent to contend that if we agree with petitioners that they sold the Wilder Avenue property to Wilder Manor Co., the gain does not constitute capital gain. If he does so contend, we do not agree. Under section 1221 petitioners' property was within the definition of capital asset unless petitioners held it for sale in the ordinary course of their trade or business. At the time petitioner entered into the contract to *222 sell the property he had held it about 12 years. He had never sold any real estate except two personal residences. Petitioner, as distinguished from Wilder Manor Co., made no division of the property. Petitioner had never intended to develop the property before selling it. Originally petitioner intended to retain title to the property and have it developed by a lessee from whom he would receive rent. When he was unable to make such a lease, he decided to sell the property to a developer. Sales by Wilder Manor Co. were clearly to customers in the ordinary course of its trade or business yielding ordinary income to it. However, such sales are not attributable to petitioner since the facts show that he sold his property to Wilder Manor Co. Under section 707 this sale is to be treated as one occurring between the partnership and one who is not a partner. None of the cases cited by respondent discussing the question of whether a sale of real property resulted in ordinary income or capital gain are comparable on their facts to the instant case. Any discussion of these cases would serve no useful purpose. We conclude from the facts here present that petitioners sold their Wilder Avenue *223 property to Wilder Manor Co., that the property was a capital asset within the meaning of section 1221, and that the gain on the sale constituted long-term capital gain. Decision will be entered under Rule 50. 758 Footnotes
1. The indication from the record is that these two corporations were affiliates of Swinerton & Walberg Co.↩
2. All references are to the Internal Revenue Code of 1954. SEC. 707. TRANSACTIONS BETWEEN PARTNER AND PARTNERSHIP (a) Partner Not Acting in Capacity as Partner. - If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner. (b) Certain Sales or Exchanges of Property With Respect to Controlled Partnerships. - (1) Losses disallowed. - No deduction shall be allowed in respect of losses from sales or exchanges of property (other than an interest in the partnership), directly or indirectly, between - (A) a partnership and a partner owning, directly or indirectly, more than 50 percent of the capital interest, or the profits interest, in such partnership, or (B) two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests. In the case of a subsequent sale or exchange by a transferee described in this paragraph, section 267(d) shall be applicable as if the loss were disallowed under section 267(a)(1). (2) Gains treated as ordinary income. - In the case of a sale or exchange, directly or indirectly, of property, which in the hands of the transferee, is property other than a capital asset as defined in section 1221 - (A) between a partnership and a partner owning, directly or indirectly, more than 80 percent of the capital interest, or profits interest, in such partnership, or (B) between two partnerships in which the same persons own, directly or indirectly, more than 80 percent of the capital interests or profits interests, any gain recognized shall be considered as gain from the sale or exchange of property other than a capital asset. (3) Ownership of a capital or profits interest. - For purposes of paragraphs (1) and (2) of this subsection, the ownership of a capital or profits interest in a partnership shall be determined in accordance with the rules for constructive ownership of stock provided in section 267(c) other than paragraph (3) of such section. (c) Guaranteed Payments. - To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a)↩ (relating to trade or business expenses).